UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11840-RGS

JIMMY L. BROWN

v.

HUSKY INJECTION MOLDING SYSTEMS, INC.

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

November 17, 2010

STEARNS, D.J.

This lawsuit brought by plaintiff Jimmy Brown against defendant Husky Injection Molding Systems, Inc. (Husky), alleges an injurious manufacturing defect in a 1525 series injection molding machine (3350 machine)[1] sold by Husky in 1974 to Brown's employer, WNA Comet East, Inc. (Comet). Specifically, Brown alleges that Husky negligently failed to attach a safety-critical Front Pulley Guard to the frame of the 3350 machine during its assembly.[2] On September 6, 2006, Brown permanently injured his left hand while attempting to clean the machine. There is no dispute that had the Front Pulley Guard been in place, the accident would not have happened. It is also undisputed that Comet rebuilt the 3350 machine from top to bottom in 2000, although Comet claims that the

---

[1] The number 3350 is the serial number of the allegedly defectively manufactured machine that Brown was operating at the time of the injury to his hand.

[2] Brown's Complaint was originally brought in five Counts. On August 30, 2010, the parties stipulated to the dismissal with prejudice of Count IV (Failure to Provide Adequate Warning Labels), and Count V (Failure to Give Adequate Instructions). The remaining Counts I through III depend on a theory of negligent and/or defective manufacture. Brown does not contend that the 3350 machine was negligently designed or that its design breached an implied warranty.

machine was refurbished in its original configuration (save for the installation of a new control panel). Husky, for its part, contends in a motion for summary judgment that Brown has no evidence that the 3350 machine was missing the Front Pulley Guard when it was delivered to Comet. A hearing on Husky's motion was held on November 3, 2010.

## BACKGROUND

Husky designed and manufactured the 1525 series of injection molding machines in the 1970s. Comet bought several of the 1525 series machines from Husky in 1974 – eventually purchasing a total of ten. In August of 1974, Husky delivered the 3350 machine to Comet, along with four other 1525 series machines bearing serial numbers 3352, 3353, 3354, and 3355. On October 4, 1974, Lou Sergo, a Husky Technical Services Technician, installed the 3350 and the other four 1525 series machines at Comet.

It is undisputed that the 1525 series was designed with a Front Pulley Guard. The assembly drawings for the 1525 series show part number 20155 designated as the Clamp Pulley Guard Front (or Front Pulley Guard). See Def. Ex. 21; Ex. 19 at 4, 38. The drawings further indicate that the Front Pulley Guard was secured to the bottom and side of the machine's frame by three mounting brackets. The mounting brackets and the Front Pulley Guard were attached to the frame by metal screws. Husky manufactured the 3350 machine and the other 1525 series machines at its Ontario, Canada plant in 1974.[3]

In 2000, Comet rebuilt the 3350 machine, stripping it to its base, and replacing or refurbishing constituent parts as needed. According to Comet's 30(b)(6) designee, Robert

---

[3] Husky discontinued the manufacture of the 1525 series in the 1970s, but Comet still operates some of these machines in its business.

Choquette, the only original part remaining on the 3350 machine after the refurbishment was the frame. Gary Boutin, Sr., another Comet 30(b)(6) deponent, testified that the 3350 machine was "completely rebuilt from the ground up," but that the only entirely new features were the electrical panel "and how to access the machine controls." In making these changes, Comet had to "explain [to its operators] the purge guards which w[ere] added . . . and redundant switches on the safety gates, which w[ere] required." Boutin Dep. at 48, 102-103.

Brown was employed by Comet as an injection molding machine operator at Comet's manufacturing plant in Chelmsford, Massachusetts. He began work at Comet in 2003. On September 6, 2006, Brown squatted down and inserted his left hand into an aperture at the base of the frame to clean "the bottom part of the machine." Brown Dep. at 34, 40-42, 56-62. While "reaching into the 3350, his left hand was caught in the belt and pulley and he suffered a crush injury to his left index, middle, and ring fingers."[4]

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."

---

[4]Although Brown initially reported that he had turned the 3350 off before attempting to clean it and that the machine had started up again on its own, he later admitted that he "might have left it on." Def. Ex. 2 at 19; Ex. 4 at 58-59, 128-129. Brown's expert concluded that Brown did not shut off the 3350 machine before inserting his hand. Def. Ex. 10 at 65-66.

Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986). While the court resolves all reasonable inferences in favor of the non-moving party, it "must ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008), quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Where a defendant "inform[s] the trial court of the basis for [its] motion and identif[ied] the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact, . . . the burden shifts to the [plaintiff], who must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Borges v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). Meeting the plaintiff's burden requires "the production of evidence that is 'significant[ly] probative.'" Id., quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Failing that, "summary judgment is appropriate." Borges, 605 F.3d at 5.

## DISCUSSION

Brown contends that the 3350 machine was defectively manufactured because Husky failed to install the Front Pulley Guard and, if it had been installed, the accident would not have happened. A claim of manufacturing defect requires proof that "a product deviates in its construction or quality from specifications or planned output in a manner than renders it 'unreasonably dangerous.'" Laspesa v. Arrow Int'l, Inc., 2009 WL 5217030,

4

\*3 (D. Mass. Dec. 23, 2009), citing Back v. Wickes Corp., 375 Mass. 633, 641 (1978). See also Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc., 573 F. Supp. 2d. 372, 380 (D. Mass. 2008) ("A defect from manufacturing, as opposed to design, occurs when a product differs from identical products issued from the same manufacturer.").

"Under Massachusetts tort law, [plaintiffs] bear 'the burden of proving that a defect attributable to the manufacturer's negligence caused the injury.'" Price v. Gen. Motors Corp., 931 F.2d 162, 165 (1st Cir. 1991), quoting Corsetti v. Stone Co., 396 Mass. 1, 23 (1985). Where "as here, the accident occurred after the defendant has surrendered control of the instrumentality involved, it is incumbent upon the plaintiff to show that it had not been improperly handled by intermediate handlers." Carney v. Bereault, 348 Mass. 502, 507 (1965). See also Price, 931 F.2d at 165 (same test); Corsetti, 396 Mass. at 23-24 (same).

Sergo, the technician who had installed the 3350 and the other 1525 series machines at Comet in 1974, testified at his deposition that all of the machines, including the 3350, were equipped with a Front Pulley Guard and that he had never removed a safety guard during any installation. See Sergo Dep. at 125-128. Moreover, he stated that he had never encountered a 1525 series machine that did not come equipped with a Front Pulley Guard. Id.

Brown, in rebuttal, relies on the testimony of Robert Roy, a Comet employee who has worked regularly with various of the company's 1525 series machines. Roy testified that no safety guards were removed from any of the 1525 model machines during his years as a Comet employee. Roy Dep. at 32-36. He also testified that he had never seen a

Front Pulley Guard on any of the 1525 series machines at Comet.[5]  Id. at 55-56.  Roy states that while he would remove a safety guard in order to service a machine's belts and pulleys, there were no pulleys or belts in the area of the 3350 where Brown's accident occurred – so there would have been no reason for anyone to remove the Front Pulley Guard.  Roy's testimony, however, fails to raise a dispute of material fact as he did not begin working at Comet until August of 1975, the year after the machines were installed, and did not operate an injection molding machine himself until he became a molder trainee in 1976.

John Demers, the Human Resources Manager at Comet, testified that his post-accident inspections of the eight 1525 series machines that Comet still owned[6] revealed that the frames of five of the machines had screw holes that could have mounted the brackets necessary to install a Front Pulley Guard (nos. 3351, 3352, 3355, 3337, and 3338), while two of the machines (3353 and 3354) did not.[7]  See Pl. Ex. 2 - Demers Aff. ¶¶ 3-4.

Richard Lawson and Robert Gove were sent to investigate the accident for Husky

---

[5] Roy testified that while there was no Front Pulley Guard, there were other guards on the 3350 machine.  Roy Dep. at 56-57.  Brown asserts that Gary Boutin, who began working at Comet in 1977, corroborates Roy – citing Boutin's Dep. at 102-103.  However, Boutin's testimony at those pages does not reference pre-rebuild safety guards.

[6] Comet disposed of the 3350 machine in the Fall of 2007.

[7] Plaintiff's expert, D. Robert Holt asserts that the absence of the screw holes on the 3353 and 3354 machines "indicates inadequate quality control in the Husky manufacturing, assembly installation process at the time that these machines were sold." Pl. Ex. 1 - Holt Aff. ¶ 11.  The court is inclined to believe that the absence of the Front Pulley Guard on the five machines that Holt concedes have the appropriate screw holes supports the inference that Comet for whatever reason had removed the guards.  Id. ¶ 10.

on September 7, 2006 (the day following).[8]  Lawson testified that he and Gove undertook to take photographs of the 3350 machine, but were frustrated in completing their report by Comet's refusal to cooperate.  Lawson noticed during his abbreviated inspection of the machine that there "was a top purge guard and a guard from the stationery platen into the operator gate that was missing."  Lawson Dep. at 46.  Lawson added that the 3350 machine was also missing "discharge guarding" – and that "[t]he discharge guarding was an ANSI requirement at that time but wasn't original equipment."  Id. at 47.[9]  Lawson further noted that there was no guarding in the area of the 3350 machine where Brown was injured, but was not surprised as "it was an obscure place, under the clamp."  Id. at 49.  Neither Lawson nor Gove made note that the 3350 machine was lacking a Front Pulley Guard.

Lawson returned to Comet in June of 2010 after he discovered a file containing the original manufacturing drawings for the 1525 series.  He inspected and photographed a machine in Comet's training room that looked like the 3350.  Lawson Aff. ¶¶ 5-8.  As part of his inspection, Lawson used the 3350 drawings to determine the position of the screw

---

[8]Lawson, a twenty-three-year Husky employee and service coordinator for the Boston area, oversaw five technicians and was responsible for troubleshooting and performing any machine investigations.  Gove was a facilities manager at Husky's Tech Center.

[9]Husky notes that under the American National Standards Institute (ANSI) standards for injection molding machines, "[t]he remanufacture of a complete [horizontal injection molding machine] shall be in conformance with clauses 5 and 8 of this standard."  ANSI § 5.1.2.  Section 5.3.1 requires that "[g]uards shall be provided where hazards exist."  Section 1.3.3 of the ANSI standards also states that "[a]n employer shall not permit a [horizontal injection molding machine] to be operated unless it is in compliance with this standard."

holes intended to accommodate the Front Pulley Guard. Lawson "felt the base of the machine and located screw holes" and then removed the layers of oil in order to photograph the base. Lawson found "two [screw holes] on the base and one up on the column" indicating that a Front Pulley Guard was (or should have been) affixed to the machine. Id.; Lawson Dep. II at 11, 24-25.

Holt, Brown's expert witness, opines that the 3350 machine was manufactured without a Front Pulley Guard. He cites two pieces of evidence in support of his theory. First, he relies on photographs of the 3355 machine (a sister machine of the 3350 located in Comet's training room), that appear to show that there are no "provisions for mounting [the Front Pulley Guard] as depicted in the original equipment drawings."[10] See Def. Ex. 11 at 2-4. Second, he relies on the testimony of Roy that he never saw a "guard, or provision for installing a guard, at the subject point of injury" on the Husky injection molding machines at Comet. Id. at 3-4.

## RULINGS OF LAW

In Carney, the leading Massachusetts case on manufacturing defect claims, plaintiff was injured when an automobile fell from a mechanic's lift. The accident occurred in 1959. The manufacturer-defendant had sold the lift to the owner of the garage in 1950, but the owner did not have it installed until 1952. Id. Plaintiff's only evidence regarding the original condition of the lift was that "the construction of the lift had not been changed since 1952." Id. In affirming the trial court's entry of a directed verdict for the defendant-

---

[10] This assertion is contradicted by Demers' testimony that he located the appropriate screw holes on the 3355 machine while inspecting it for Comet.

manufacturer, the Supreme Judicial Court observed that "plaintiff did not make out a case for the jury against" the lift manufacturer because "[t]here is no evidence negativing the possibility that the condition of the lift had changed due to deterioration or mishandling" during the two years after the manufacturer had sold the lift to Gulf. Id. at 452.

There is a crucial distinction between a claim of a design defect and a claim of defective manufacture. In the former instance, a plaintiff need only prove that a defect in the design existed at the time the product left the manufacturer – he or she has no obligation to negate the possibility of subsequent mishandling of the product by intermediaries. See Smith v. Ariens Co., 375 Mass. 620, 626 (1978). The rule is different when the alleged defect is not attributed to the design, but to the improper assembly of the product.

> In . . . these types of cases, a particular product, rather than a line of products, is alleged to be defective because of negligence in the manufacturing process. Because the defect is alleged to have been caused by a manufacturing error affecting only one particular product, to show that the defect is attributable to the manufacturer, the plaintiff must show that it was not caused by intermediaries. In a case alleging negligent design, this showing is not logically necessary since the distribution by the manufacturer of a product with a particular design is sufficient to show that the claimed defective design is attributable to the manufacturer.

Id. at 626-627. See also Kenney v. Sears, Roebuck & Co., 355 Mass. 604, 607-608 (1969) (plaintiff failed to eliminate the possibility that an allegedly defectively manufactured refrigerator had not been mishandled by the seller-installer); Restatement (Second) of Torts § 402A cmt. g (1965) (plaintiff bears the burden of proving that the product was in a defective condition at the time it left the seller's hands). Compare Collins v. Sears, Roebuck & Co., 31 Mass. App. Ct. 961, 961 (1992) (no evidence that the dryer's electrical

system where the fire originated had ever been touched or worked on or after its sale to plaintiffs).

Relying on <u>Mullins v. Pine Manor College</u>, 389 Mass. 47, 58 (1983), Brown argues that he "need not eliminate all possibility that the defendant's conduct was not a cause, but need only introduce evidence from which a reasonable juror could conclude that it was more probable than not that the injuries were caused by the defendant's conduct." Pl. Opp. Mem. at 13. This is true only in so far as it goes. While a plaintiff need not show liability by anything more than a preponderance of evidence, he is still required to show "a greater likelihood that his injury was caused by the defendant's negligence than by some other cause." <u>Coyne v. John S. Tilley Co.</u>, 368 Mass. 230, 239 (1975), quoting <u>Jankelle v. Bishop Indus. Inc.</u>, 354 Mass. 491, 494 (1968). While Brown is able to offer some evidence – for example, the fact that it was Comet's "policy" not to remove safety equipment from its machines and the testimony of Roy, who sometime after 1974 observed the 1525 series machines not to have safety guards,[11] he has no evidence to rebut Sergo's testimony that the Front Pulley Guards were present when the machines were installed in 1974. Nor is he able to account for the condition of the machines from the time they were installed by Sergo until the time Roy made his observations, or more critically, to the presence or absence of guards before and after the 2000 refurbishment of the 3350 machine by Comet.[12] In sum, Brown's case fails for want of the critical element of

---

[11]Comet's "policy" and Roy's observations are noticeably in conflict.

[12]Roy's testimony and the observations of Demers strongly suggest that the various safety guards were removed from the machines and not replaced by Comet over the course of their years of use.

causation.[13]

## ORDER

For the foregoing reasons, Husky's motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for Husky and close the case.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE

---

[13]"[I]ssues related to causation rather than defectiveness typically dominate cases based on claims of manufacturing defects. . . . [T]he crucial issue is often whether the plaintiff's proof sufficiently establishes that the accident was attributable to a manufacturing defect as opposed to some other plausible cause – such as normal wear and tear or the conduct of the user or someone else.  In general, a plaintiff must establish, by a reasonable probability, that the product contained a defect attributable to the manufacturer and that such hypothesis is more likely than any other suggested by the evidence. . . . [A]n allegation of a manufacturing defect properly will be dismissed if the plaintiff fails to prove, one way or another, that the product contained a defect that caused the harm and that the defect was in the product when it left the manufacturer's control." David G. Owen, <u>Manufacturing Defects</u>, 53 S.C. L. Rev. 851, 859 (2002) (footnotes omitted).